UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>V.<br><br>JOHNATHAN MENDOZA-RICARDO,<br><br>Defendant. | CRIMINAL NO. 5:19-40-KKC<br><br>ORDER AND OPINION |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the Defendant's Motion to Suppress (DE 47). For the reasons stated below, that Motion is **DENIED**. The parties have also filed a Motion to Continue trial based on the pending suppression motion. Based on this Order and Opinion, that Motion (DE 79) is **DENIED AS MOOT**.

## I. BACKGROUND

On February 5, 2019, Homeland Security Investigations ("HSI") observed two males load suspected bales of marijuana into a Toyota Highlander ("Highlander") in Phoenix, Arizona. (DE 47-1 at 1.) The HSI agents began surveilling the Highlander and followed it as it began to travel east across the country. (DE 47-1 at 1.) Over the course of a couple days, the agents trailed the Highlander to Nicholasville, Kentucky. During the course of their surveillance, the agents were able to identify one of the occupants of the Highlander—Fabian Noperi. (DE 54 at 1-2). Agents were familiar with Noperi based on previous drug trafficking investigations. (DE 54 at 2.) The agents observed the Highlander pull into a shopping mall parking lot making several turns in different directions. Thereafter, the Highlander continued to a residence (the "Green Street

1

Residence") in Nicholasville, where it parked in the driveway. (DE 54 at 2.) Although they did not directly observe anyone exit the Highlander, Agents believed the occupants exited and entered the residence.

Agents notified the Nicholasville Police Department ("NPD") of their investigation and requested standby assistance. (DE 47-1 at 2.) The agents then positioned themselves around the Green Street Residence. During their surveillance, the agents observed a white work-truck with "Mendoza Painting and Landscaping" written along the side pull up to the residence. Two Hispanic men exited the vehicle and entered the residence. Agents identified one of the males as Fabian Zavala-Romero, a known illegal alien and suspected drug trafficker. Agents then saw someone access the Highlander. The two men then returned to the work-truck, carrying objects wrapped in plastic bags. (DE 47-1 at 2.) Thereafter, the work-truck departed the residence. (DE 47-1 at 2.)

Agents contacted standby NPD officers and requested their assistance in performing a traffic stop on the work-truck. (DE 54 at 2.) Agents described the truck and told officers that at least one of the occupants was a known illegal alien named Fabian Zavala-Romero. (DE 47-2 at 5.) NPD performed the traffic stop on the work-truck, detained the occupants, and attempted to confirm their identities. The other occupant identified himself as Jonathan Mendoza-Ricardo and provided officers with a social security card and Georgia license. Mendoza informed officers that he spoke very little English.

Contemporaneously with the departure of the work-truck, events began unfolding at the Green Street Residence. Agents observed Noperi and another individual, later identified as Jesus Sabino Castro-Quinones, unloading the suspected bales of marijuana from the Highlander. Thereafter, Agents decided to move in and secure the residence. One of the individuals from the residence

then spotted the surrounding agents. (DE 54 at 2.) He attempted to jump out of a window in the rear of the residence, but quickly retreated back inside after police identified their presence. The agents on the scene quickly coaxed the individuals out of the residence by issuing verbal commands. (DE 54 at 2.) Immediately thereafter, one of the individuals, later confirmed as Noperi, confessed that firearms and marijuana were inside the residence. (DE 54 at 2.) Additionally, he implicated both occupants of the work-truck, stating that they were headed to "get the money." (DE 54 at 2.)

After Mendoza and Zavala were implicated in the drug trafficking, HSI Agent Brian Patterson—who helped secure the Green Street Residence—was directed to head to the traffic stop. When he arrived, both occupants of the work-truck had already been detained. Patterson spoke with Zavala and Mendoza briefly at the scene, and thereafter, they were transported to the NPD for further questioning. Once there, Mendoza waived his *Miranda* rights and made several incriminating statements. (DE 47-1 at 3.)

Mendoza has filed a Motion to Suppress, which asserts that the traffic stop was unlawfully prolonged, and his arrest lacked probable cause. (DE 47-1 at 1.) The Court held an evidentiary hearing where HSI Agents, Bryan Elton and Patterson, and NPD Detective, Jeff Fryman, testified to the facts stated above. As further explained below, after considering their testimony, the evidence presented, and the parties briefs, the Court finds that the traffic stop was not unlawfully prolonged, and Mendoza's arrest was based on probable cause. Accordingly, Mendoza's Motion to Suppress (DE 47) is denied.

## II. ANALYSIS

**A. The traffic stop involving Mendoza was not unconstitutionally prolonged.**

Pursuant to the Fourth Amendment, absent reasonable suspicion, police cannot extend an otherwise completed traffic stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) ("A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable searches and seizures.") A seizure becomes unlawful when it is prolonged beyond the time reasonably necessary to complete the intended "mission" of the traffic stop. *Id.* at 1615. This "mission" includes inquiries such as checking licenses, determining whether there are outstanding warrants for any of the occupants, inspecting automobile registration, and checking proof of insurance. *Id.*

There were multiple purposes for the traffic stop in this case. First, was to detain and question the HSI-identified illegal alien traveling within the borders of the United States. (*See* DE 47-2). Second, to determine the identity of the driver, later identified as Mendoza, who was transporting a known illegal alien within the borders of the United States. Third, to question the occupants of the work-truck about their suspected drug-trafficking activities.

As evidenced by the bodycam videos, the entire duration of the traffic stop was approximately twenty-four minutes. (DE 72.) Within the first two minutes of the traffic stop, Zavala was removed from the passenger's side of the work-truck and detained. The driver, Mendoza, provided police with his vehicle information, a social security card, and a Georgia license. At this time, police asked Mendoza to exit the vehicle. He was placed in handcuffs and his outer clothing was briefly patted down. Police asked Mendoza if he spoke any English, to which he replied, "a little." Mendoza was brought about ten feet away from the work-truck while police continued their investigation.

Police then turned their attention to Zavala. He was patted down, searched, and placed in the back of a police cruiser.

At approximately four minutes into the traffic stop, police began reviewing the documents provided by Zavala and Mendoza. Officers also began searching the work-truck. Approximately ten and a half minutes into the traffic stop, bodycam footage shows police attempting to verify Mendoza's identification over police radio. For the next several minutes, it appears that the officers continue to await verification of Mendoza's identity and immigration status.

Approximately fifteen minutes into the traffic stop, bodycam footage shows the officers continuing to search the work-truck. Additionally, it appears that police are still trying to confirm Mendoza's identity and determine whether he has any outstanding warrants.

HSI agents arrive on the scene approximately sixteen and a half minutes into the traffic-stop. It is apparent that officers have not completed their investigation.

One of the HSI officers, who spoke Spanish, briefly communicated with Mendoza and Zavala. Thereafter, the HSI agent stated that both individuals needed to be transported to the NPD for further questioning. The footage shows the HSI agents reviewing and attempting to verify the provided identification documentation. Mendoza was then searched and placed in the back of a police cruiser for transport to the NPD.

At the evidentiary hearing, Patterson testified that he was involved in securing the perimeter of the Green Street Residence. He testified that he remained at the Green Street Residence until after the individuals at the residence were detained by police. He stated that thereafter, he was directed to head to the traffic stop to assist the NPD officers. Patterson further testified that it took approximately fifteen minutes to get from the Green Street Residence to the site of the traffic stop. HSI Agent Brian Elton also testified regarding the events at the Green Street Residence. He stated that following Noperi's implication of Zavala and Mendoza in the drug-trafficking, HSI agents

5

were sent to the traffic stop to assist and confirm that the occupants of the work-truck were the same individuals that departed from the residence.

Based on the evidence presented, the Court finds that the traffic stop was not unconstitutionally prolonged. By the time HSI agents arrived at the scene of the traffic stop and confirmed that Zavala and Mendoza were the individuals seen at the Green Street Residence, there was probable cause to arrest both of them. There is nothing to indicate that police prolonged the traffic stop so that they could garner probable cause. In fact, the bodycam footage supports the opposite conclusion. Just before HSI agents arrive at the site of the traffic stop, NPD officers are seen continuing to search the work-truck and attempting to confirm identification documents with dispatch.

As stated above, there were multiple purposes for the traffic stop—(1) detain and question the HSI-identified illegal alien, Zavala, traveling within the borders of the United States; (2) determine the identity of the driver who was transporting a known illegal alien within the borders of the United States; and (3) question the occupants of the vehicle about their suspected drug-trafficking activities. None of these "missions" were completed by the time probable cause arose to arrest Mendoza. The Court also considers that the entire traffic stop lasted only twenty-four minutes and finds that such time is not unreasonable in light of the various purposes for the traffic stop. Accordingly, the traffic stop was not unconstitutionally prolonged.

**B. Officers had reasonable suspicion to stop Mendoza for questioning, which rapidly developed into probable cause as the events unfolded at the Green Street Residence.**

In addition, the Court also finds that the officer's had reasonable suspicion to detain and question Mendoza. Reasonable suspicion depends on the totality of the circumstances. *United States v. Winters*, 782 F.3d 289, 298 (6th Cir. 2015). Reasonable suspicion requires "more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause and falls

considerably short of satisfying a preponderance of the evidence standard." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). The officer must possess a particularized and objective basis for suspecting the person is involved in criminal activity. *Eisnnicher v. Bob Evans Farms Rest.*, 310 F. Supp. 2d 936, 946 (S.D. Ohio 2004). Additionally, the officer must possess specific and articulable facts which, when taken together with rational inferences from those facts, warrant an investigatory stop. *Id.*

Here, there are two bases for reasonable suspicion: (1) Mendoza was transporting a known, undocumented illegal alien—possibly in violation of federal law, *see* 8 U.S.C. § 1324; (2) Mendoza was a suspected drug trafficker.

Elton testified that when the work-truck pulled up to the Green Street Residence, he had a clear view of Zavala and immediately recognized him as an illegal alien from past investigations. Elton stated that he learned Zavala was involved in drug trafficking in the Lexington area and confirmed his identity through viewing photos on his Facebook page.

When the work-truck departed the Green Street Residence, HSI agents sought assistance from the NPD. Agents described the truck to the NPD officers on standby. They stated that a white work-truck with a business-name logo had just departed the Green Street Residence, turning left on to Chestnut Street travelling west toward S. Main Street. (*See* 47-2 at 4-5.) NPD officers were positioned one street north of Chestnut and readily spotted a white truck with a latter rack traveling north. They followed the truck and sought confirmation from HSI that this was the truck that had just departed from the Green Street Residence. NPD officers asked if there was a latter rack on the truck and if "Mendoza Paining" was written on the side. Agents confirmed that it was the correct vehicle and instructed officers to perform a traffic stop.

7

Considering the foregoing facts, the NPD officers possessed reasonable suspicion warranting an investigatory stop. There was a particularized and objective basis, based on specific and articulable facts, for suspecting Mendoza was involved in criminal activity: (1) officers observed the driver of the work-truck, later identified as Mendoza, transporting Zavala, an individual known to be an illegal alien and suspected drug trafficker; (2) the agents confirmed their identification of Zavala by locating his Facebook page; (3) agents informed NPD that a white work-truck had recently departed the Green Street Residence and that the passenger was a known illegal alien; (4) Agents informed NPD that the work-truck turned left on Chestnut, heading west, when it departed the residence; (5) officers readily spotted a white truck matching the description of the work-truck one road north of where it was last seen; (6) officers asked agents if the work-truck had a ladder rack and Mendoza Painting written on the side; and (7) agents confirmed that the NPD-spotted work-truck was the same truck that had recently departed the Green Street Residence. These facts, when considered in their totality, warranted a stop and further investigation of Mendoza on the basis that he was transporting Zavala, a known illegal alien and suspected drug trafficker.

The police also had reasonable suspicion that Mendoza was a drug trafficker. HSI agents observed two individuals load suspected bales of marijuana into the Highlander in Phoenix, Arizona. Agents testified, that based on their training and experience, marijuana traffickers often package the marijuana in bales for transport. During their drive across the country, Agents identified one of the individuals in the Highlander as Noperi. Agents were familiar with Noperi from past drug trafficking investigations. Agents followed the Highlander to Nicholasville, Kentucky, where they observed it turn into a shopping center and make several successive turns—also known as a "counter surveillance run". Agents testified that, based on their training and experience, drug traffickers will often perform a counter surveillance run right before they reach

their final destination in order to determine if they are being followed by police. Agents further testified that typically, drug traffickers will then travel to a "stash house"—a house used to store illegal drugs. Agents then followed the Highlander until it reached a residence, which they suspected was a stash house. The Highlander was parked in the driveway, and Agents suspected the occupants entered the residence.

Agents set up surveillance and saw a white-work truck approach the residence. The work-truck drove directly past Agent Elton, who got a clear view of the passenger. Elton immediately recognized the passenger as Zavala, a known, undocumented illegal alien and suspected drug trafficker. Elton confirmed Zavala's identity by locating photos on his Facebook page.

The two occupants of the work-truck, later confirmed as Zavala and Mendoza, pulled up to the residence, exited the vehicle, and walked into the house. Notably, they did not knock on the door. Instead, they entered the home as if it was their own. Agents then observed someone access the Highlander. Thereafter, Zavala and Mendoza returned to the work-truck, carrying items in plastic bags, and departed the residence. Agents then requested the NPD follow the work-truck and perform a traffic stop.

The exact chronological order of the next set of events is unknown. However, the evidence and testimony indicate that the events at the Green Street Residence unfolded contemporaneously with the departure of the work-truck.

At the Green Street Residence, Agents observed Noperi and Castro unload the suspected bales of marijuana from the Highlander. The Agents decided to secure the residence and were spotted by Noperi and Castro. One of them attempted to jump from a window in the rear of the residence, but he quickly retreated back inside after police identified their surrounding presence. Agents issued verbal commands, and Noperi and Castro exited the house within five minutes. Noperi

9

immediately confessed that firearms and marijuana were inside the residence. He implicated both men traveling in the work-truck and stated they were going to get the money.

Meanwhile, NPD officers were positioned one street north of where the work-truck was last seen. Officers readily located the work-truck and began to follow it. Officers contacted the agents to confirm that this was the work-truck that had just departed the Green Street Residence. NPD officers asked if there was a latter rack on the truck and if "Mendoza Paining" was written on the side. Agents confirmed that it was the correct vehicle and instructed NPD to perform a traffic stop.

Agent Elton testified that following Noperi's implication of Zavala and Mendoza in the drug-trafficking, HSI agents were sent to the traffic stop to assist and confirm that the occupants of the work-truck were the same individuals that departed from the residence. Further, Agent Patterson testified that after agents had secured the scene and Noperi had confessed, he was sent to the scene of the traffic stop. Patterson also testified that it took him approximately fifteen minutes to travel from the Green Street Residence to the site of the traffic stop. The bodycam footage shows Patterson arriving at the scene within seventeen minutes of the initiation of the traffic stop.

The Court finds that the foregoing facts are sufficient to establish reasonable suspicion to detain and question Mendoza regarding his involvement with the drug trafficking activity occurring at the Green Street Residence. Agents suspected, and later confirmed, that the two occupants of the Highlander were drug traffickers and the Green Street Residence was a stash house being used to store marijuana. Mendoza was observed at the stash house, entering the residence, seemingly familiar with it. Agents testified that, in their training and experience, usually only people involved in the drug conspiracy know about the location of a stash house. In addition, Mendoza was transporting Zavala, an undocumented illegal alien and suspected drug trafficker.

These facts, when considered in their totality, provide an objective basis for believing Mendoza was involved in criminal activity.

As the events unfolded at the Green Street Residence, the officers' reasonable suspicion rapidly developed into probable cause. Probable cause is based on the totality of the circumstances, considered from the standpoint of an objectively reasonable officer. *See United States v. Brooks*, 270 F. App'x 382, 384 (6th Cir. 2008). "The evidence available to the officer must be sufficient to lead a reasonable person to believe that the arrestee has probably committed or was about to commit a crime." *Id.* Considering the facts in their totality, once Noperi implicated Mendoza in the drug trafficking conspiracy, it was reasonable for police to conclude that Mendoza had committed a crime. At this point, the officers had probable cause to arrest Mendoza. The evidence indicates that such probable cause arose contemporaneously with the initiation of the traffic stop. Accordingly, the Court finds that Mendoza's detention was not unlawful, and the evidence should not be suppressed.

### III. CONCLUSION

Based on the foregoing, the Court **HEREBY ORDERS** as follows:

(1) The Defendant's Motion to Suppress (DE 47) is **DENIED**;

(2) The Parties' Joint Motion to Continue (DE 79) is **DENIED AS MOOT**.

Dated June 4, 2019.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY